## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICHARD MACK and CASIMIRA MACK, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0588-BWD |
| | ) | |
| HERON BAY ASSOCIATES, LLC, a | ) | |
| Delaware Limited Liability Company, and LC | ) | |
| HOMES DE, INC. d/b/a LC HOMES, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## POST-TRIAL FINAL REPORT

Final Report:  December 7, 2023
Date Submitted:  November 8, 2023

Dean A. Campbell, Law Office of Dean A. Campbell, P.A., Milton, Delaware; *Attorney for Plaintiffs Richard Mack and Casimira Mack*.

Jeffrey M. Weiner, Law Office of Jeffrey Weiner, Wilmington, Delaware; *Attorney for Defendants Heron Bay Associates, LLC and LC Homes Delaware, Inc.*

**DAVID, M.**

Through this action, plaintiffs Richard and Casimira Mack seek rescission of a 2015 agreement through which they contracted with developer Heron Bay Associates, LLC and home builder LC Homes Delaware, Inc. for the purchase of a new construction home in Lewes, Delaware. The plaintiffs contend that the defendants committed fraud by misrepresenting and omitting material information concerning longstanding drainage problems affecting the plaintiffs' lot and the subdivision generally. In this post-trial final report, I conclude that the plaintiffs have failed to prove fraud, and recommend that their request for rescission be denied.

## I. BACKGROUND

The following facts are drawn from the factual stipulations in the parties' Pre-Trial Stipulation and Order and the evidence presented at a three-day trial held on June 4, 5, and 6, 2023.[1]

### A. The Parties, The Subdivision, And Lot 143

Non-party Capano Management Company ("Capano Management") is a Delaware corporation engaged in real estate development, construction, and property management.[2]

---

[1] The Stipulation and Pre-Trial Order is cited as "PTO ¶ __". Trial testimony is cited as "Tr. at __". Plaintiffs' and Defendants' trial exhibits are cited as "PX __" and "DX __", respectively.

[2] Tr. at 472:1-6; 503:-3; 520:18-20.

Defendant Heron Bay Associates, LLC ("Heron Bay LLC"), an affiliate of Capano Management, is a Delaware limited liability company that was formed to develop a subdivision in Lewes, Delaware, known as "Heron Bay" (the "Subdivision").[3] Non-party Louis J. Capano, III is the Manager of Heron Bay LLC.

Defendant LC Homes Delaware, Inc. ("LC Homes"), also an affiliate of Capano Management, is a Delaware corporation that builds new construction homes in Delaware.[4]

In 2016, Plaintiffs Richard and Casimira Mack ("Plaintiffs") contracted with Heron Bay LLC and LC Homes to purchase a new construction home on lot 143 of the Subdivision, located at 29977 Crocodile Cove in Lewes, Delaware ("Lot 143").

The following graphic illustrates the location of Lot 143 and surrounding lots within the Subdivision:



---

[3] *Id*. at 502:23-503:3.

[4] *Id*. at 471:12-472:5; 503:5.

## B. Heron Bay LLC Prepares A Stormwater Management Plan To Address Drainage Issues In The Subdivision.

In early 2013, the owner of Subdivision Lot 144, Harry Jones, informed the Sussex Conservation District ("SCD") that he was concerned ongoing construction had altered the elevation of nearby Lot 142, creating potential drainage problems for surrounding lots.[5] In March 2013, SCD concluded that "[t]he elevation of lot # 142 appear[ed] to have been raised sufficiently," but noted that "[w]hen construction begins on lot # 143, it will be imperative for the builder, developer to consult and to work closely with the district before arbitrarily changing the existing grades."[6] SCD further indicated that "[i]f the elevation of lot # 143 is altered, lot # 142 may be negatively impacted."[7]

By early 2015, SCD had become aware of broader "contributory drainage" issues throughout the Subdivision. At trial, Jessica Watson, a Program Manager at SCD, testified that at the time, water was draining from higher elevated lots—Lots 132 through 135—onto lower elevated lots—Lots 144 through 149—where it became "trapped" and failed to drain into the roadside swales along Crocodile Cove.[8]

---

[5] PX 11.

[6] *Id.*

[7] *Id.*

[8] Tr. at 245:21-23; 246:7-11; 247:16-23; 248:1-3.

3

SCD directed Heron Bay LLC to prepare a stormwater management plan to resolve this "contributory drainage" problem.[9]

In February 2015, Heron Bay LLC's architect, engineering, and surveying firm, Davis, Bowen and Friedel, Inc., prepared a stormwater management plan intended to improve drainage throughout the Subdivision (the "February 2015 Stormwater Management Plan"). The February 2015 Stormwater Management Plan was approved by SCD as well as the Sussex County Engineering Department ("SCED"), which, by 2015, had also become aware of drainage issues impacting roadside swales in the Subdivision.[10]

## C. SCED Confirms That Drainage Improvement For Lots 125 Through 149 Is Complete.

On June 17, 2015, SCED sent Mr. Capano a letter identifying "several conditions at the Heron Bay subdivision that require[d] attention."[11] SCED noted that while it "ha[d] provided lists of work items to [Heron Bay LLC's] contractor in the past [that] w[ere] never completed," "[t]he recent drainage improvement for lots 125 thr[ough] 149 [wa]s largely complete and [SCED] thanks you for your efforts."[12]

---

[9] *Id*. at 244:13-14.

[10] *Id*. at 162:14-164:8. *See* DX 7 (noting SCED approved Heron Bay LLC's plan to improve drainage on Lots 144 through 149 "on April 24, 2015 as an amendment to the plan approved by the SCED on May 3, 2005").

[11] PX 6 at.

[12] *Id*.

4

On September 15, 2015, SCED sent Mr. Capano a follow-up letter listing "all current site work items . . . that require[d] immediate attention," reporting that Heron Bay LLC "ha[d] addressed some items listed and those items are noted as complete," while "other items [we]re in the process of being addressed."[13] SCED's letter confirmed that "[t]he drainage improvement project in the vicinity of lots 125 thr[ough] 149, ha[d] been completed and [wa]s being monitored by the [SCD]."[14]

On October 9, 2015, William Krapf, Chief Development Officer of LC Homes, responded to SCED's September 15, 2015 letter.[15] In his response letter, Mr. Krapf noted that, "[a]s you indicated, the drainage improvement project in the vicinity of lots 125 thr[ough] 149 has been completed. I would add that the repairs performed well during the recent heavy rains."[16] At trial, Mr. Krapf testified that he was not aware of "any issues with the drainage improvement project in the vicinity of Lots 125 through 149" after October 9, 2015.[17]

---

[13] PX 7 at 1.

[14] *Id.*

[15] DX 14.

[16] *Id* at 1.

[17] Tr. at 502:11-15.

**D.     Plaintiffs, Heron Bay LLC, and LC Homes Enter Into A Purchase Agreement.**

On October 21, 2015, Plaintiffs, Heron Bay LLC, and LC Homes entered into an Agreement of Purchase and Sale (the "Purchase Agreement"), pursuant to which Heron Bay LLC and LC Homes agreed to sell, and Plaintiffs agreed to buy, a "Milton II" model, new construction home on Lot 143.[18]   The Purchase Agreement incorporated a "Seller's Disclosure of Real Property Condition Report" (the "Seller's Disclosure"), attached thereto as Exhibit D.[19]

**E.     Heron Bay LLC, LC Homes, And Sussex County Enter Into A Memorandum Of Understanding Requiring Improvements To The Subdivision.**

Throughout 2015, 2016, and early 2017, Heron Bay LLC and LC Homes continued to work with SCED to address the County's outstanding requests.

On March 17, 2017, Sussex County, Heron Bay LLC, and LC Homes entered into a Memorandum of Understanding ("MOU"), pursuant to which Sussex County agreed to issue new building permits, conditioned on Heron Bay LLC and LC Homes making certain improvements throughout the Subdivision.[20]   Those improvements included "completion of drainage improvements and corrections"; improvements to

---

[18] PX 1; DX 13 at 1-6.

[19] DX 13 at 4.

[20] PX 9.

the Subdivision's amenities; improvements to and the completion of a "jogging loop trail"; "meet[ing] the final design documents" "associated [with] road and off-road drainage in . . . [a] portion of Phase 3," *i.e.*, a later phase of the Subdivision; "agree[ing] to have all future driveway pipes in the [Subdivision] staked and an as-built survey prepared by a licensed inspector"; and "performing the [MOU] in good faith . . . ."[21]

At trial, Sussex County Engineer Hans Medlarz testified that Heron Bay LLC "fully complied with" the MOU, and "[Sussex County] started issuing [building permits]" at some point thereafter.[22]

### F. Plaintiffs Complain Of Poor Drainage On Lot 143.

Plaintiffs closed on Lot 143 in August 2016.[23] By early 2017, Plaintiffs began complaining of poor drainage on their property.[24]

---

[21] *Id.* at 2-3. The MOU states that "the Development has experienced significant road and off-road drainage issues in addition to driveway pipe settling issues, and [Heron Bay LLC] is in the process of addressing those drainage issues but work remains to be completed." *Id.* at 1. But eleven days before the MOU was signed, on March 6, 2017, Mr. Medlarz emailed Mr. Krapf, clarifying that "[t]he initial drainage issues were 'significant' but I concur that the remaining drainage issues are not 'significant' . . . ." PX 10.

[22] Tr. at 176:7-10.

[23] *Id.* at 20:7; PX 3.

[24] PX 13.

7

According to Mr. Mack, "almost every time it rains," water drains from other properties and pools in his yard.[25] Mr. Mack testified that he is unable to use his yard because it is "very spongy," and "in some spots, continuously after 48 hours, you will sink into it and you will see the water there."[26] He also testified that the sump pump in his basement, located directly below his bedroom, "will continually go off, sometimes for days," keeping him awake at night.[27] Mr. Mack began to keep a "sump pump log," tracking each time the sump pump discharged so that he could "forward an email to LC Homes and advise them, this is how many times it went off during a certain period."[28]

At trial, Plaintiffs introduced into evidence several photographs showing standing water on Lot 143 between January 2017 and May 2023, but offered no evidence to demonstrate when any rainfall occurred prior to those photographs being taken.[29] Defendants, on the other hand, produced weather reports showing rainfall

---

[25] Tr. at 24:20-25:3; 26:2-11.

[26] *Id*. at 26:19-21.

[27] *Id*. at 62:9-12.

[28] *Id*. at 45:15-22; PX 29.

[29] The dates for many of Plaintiffs' photographs are unclear. *See* PX 18 (undated photograph); PX 25 (same); *see also* PX 13 (email with ten photographs placed behind it, but which were not attached to the top email in the chain); PX 14 (seven photographs labeled with date of April 20, 2019, but metadata suggests photographs were taken on December 20, 2018); PX 19 (photograph labeled with date of April 5, 2020, but Mr.

on or within forty-eight hours prior to the date of nearly every photograph Plaintiffs

introduced.[30]

Two neighbors in the Subdivision testified at trial about the condition of Lot

143, owned by Plaintiffs, and Lot 144, owned by their next-door neighbor, Mr.

Pollinger testified that the date reflects when the photograph was posted on social media, not when it was taken).

For most of Plaintiffs' dated photographs, Defendants introduced weather reports showing that rain occurred less than forty-eight hours prior to the photograph being taken. *See* PX 29 (nine photographs with date of January 25, 2020, for which Defendants introduced January 2020 weather reports); PX 30 (seven photographs dated February 13, 2023, for which Defendants introduced February 2023 weather reports); PX 31 (nine photographs dated January 1, 2021, for which Defendants introduced January 2021 weather reports). For two others, where weather reports were not provided, Plaintiff still failed to prove that there was not a rain event immediately prior to the photograph being taken. *See* PX 22 (photograph with handwritten date of April 30, 2023); PX 23 (three photographs with handwritten date of May 4, 2023).

[30] *See* Defs.' Trial Exs. 1 (four photographs with handwritten date of August 29, 2017 and metadata date of January 23, 2018, with weather reports from August 2017 and January 2018); *id.* 2 (five photographs with handwritten date of December 19, 2018 and metadata date of January 20, 2019, with weather reports from December 2018 and January 2019); *id.* 3 (six photographs with handwritten date of December 30, 2018 and metadata date of April 20, 2019, with weather reports from December 2018 and April 2019); *id.* 4 (nine photographs with handwritten date of January 25, 2020 and metadata date of January 27, 2020, with weather reports from January 2020); *id.* 6 (two photographs with metadata date of December 7, 2020, with weather reports from December 2020); *id.* 7 (eight photographs labeled with date of December 15, 2020 and metadata date of December 14, 2020, with weather reports from December 2020); *id.* 8 (five photographs labeled with dates of January 3 and 5, 2021, with weather reports from January 2021); *id.* 9 (one photograph labeled with date of February 9, 2021, with weather reports from February 2021); *id.* 10 (one photograph labeled with date of December 3, 2022, with weather reports from December 2022); *id.* 11 (two photographs labeled with date of January 26, 2023, with weather report from January 2023); *id.* 12 (two photographs labeled with date of February 13, 2023, with weather report from February 2023); *id.* 13 (one photograph labeled with date of March 4, 2023, with weather report from March 2023).

Jones. One neighbor, Christopher Pollinger, testified that before Lot 143 was developed, some homeowners in the Subdivision referred to the area between Lot 143 and Lot 144 as "Jones' Fishing Hole," after a photograph was posted on the community Facebook page showing a neighbor casting a fishing pole into standing water after a rainstorm.[31] Mr. Pollinger testified that on Lot 144 next door to Plaintiffs, "numerous days after a rain," the yard still makes a "goosh-goosh" sound, but since LC Homes made the improvements, "when it rains, there's still water that's going to come down that swale between [Lots 143 and 144], but it doesn't last over 48 hours."[32] Another neighbor, Howard Drinkwine, testified that Plaintiffs' property is still "probably pretty moist," although the swales near the property have gotten "a lot better."[33]

### G. Procedural History

On July 31, 2019, Plaintiffs initiated this action through the filing of a Complaint For Injunctive Relief And Specific Performance.[34] On February 26,

---

[31] PX 19; Tr. at 201:14-17; 215:1-19; 222:2-3.

[32] *Id*. at 226:13-16; 227:10-14.

[33] *Id*. at 205:18-20; 210:5.

[34] Dkt. 1. After Plaintiffs initiated this action, Defendants continued attempts to address Plaintiffs' drainage concerns. For example, (1) in 2020, LC Homes moved the rear swale from Plaintiffs' property line ten feet onto Lot 133, which was owned by Heron Bay LLC; (2) on July 2, 2020, Defendants requested that Becker Morgan Group conduct a

10

2021, Plaintiffs filed an Amended Complaint For Injunctive Relief And Specific Performance (the "Amended Complaint").[35] The Amended Complaint alleges three counts: Count I seeks "injunctive relief to enjoin water trespass"; Count II seeks specific performance of a remediation plan with SCD; and Count III seeks rescission of the Purchase Agreement due to fraud.[36] Plaintiffs no longer seek relief under Counts I and II.

A three-day trial was held on June 4, 5, and 6, 2023.[37] Post-trial briefing was completed on September 12, 2023, and post-trial oral argument was heard on November 8, 2023.[38]

## II. ANALYSIS

Plaintiffs allege that Heron Bay LLC and LC Homes committed fraud by misrepresenting or omitting to disclose material information in the Seller's

---

topographic survey, which concluded that the ground outside Plaintiffs' foundation wall had a positive slope sufficient to drain water away from the home; and (3) in September 2020, Defendants replaced a cracked sump pump in Plaintiffs' home, extended the drain attached to the sump pump, and installed foam insulation in Plaintiffs' crawl space. *See* Tr. at 525:15-527:8; DX 38; DX 40; DX 42; DX 44. In addition, during this time, SCD conducted on-site inspections of the Subdivision and determined that the "entire project," including Lot 143, complied with SCD requirements. *See* DX 45; DX 49.

[35] Am. Compl. For Inj. Relief And Specific Performance [hereinafter, "Am. Compl."], Dkt. 22.

[36] Am. Compl. ¶¶ 22-42.

[37] Dkt. 57.

[38] Dkt. 74.

Disclosure incorporated by reference in, and attached to, the Purchase Agreement. As a remedy, Plaintiffs seek rescission of the Purchase Agreement.

"Under common law, a finding of fraud requires: 1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance." *Grzybowski v. Tracy*, 2013 WL 4053515, at *4 (Del. Ch. Aug. 9, 2013). Plaintiffs bear the burden to prove each element by a preponderance of the evidence. *Id.* "To be fraudulent, the false representation need not 'consist merely of overt misrepresentations, but 'may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.' The disclosure provisions of 6 *Del C.* §§ 2572 and 2573 create such a duty, requiring a seller's disclosure report." *Id.* (citation and internal footnote omitted).[39]

---

[39] *See* 6 *Del C.* § 2572(a) ("Except as excluded by § 2577 of this title hereof, a seller transferring residential real property shall disclose, in writing, to the buyer, agent and subagent, as applicable, all material defects of that property that are known at the time the property is offered for sale or that are known prior to the time of final settlement."); 6 *Del C.* § 2573 ("The agent, subagent or seller, as applicable, shall give a copy of the Seller's Disclosure of Real Property Condition Report to all prospective buyers or prospective buyer's agent prior to the time the buyer makes an offer to purchase. This written disclosure form, signed by buyer and seller, shall become a part of the purchase agreement.").

## A. A False Representation Or Omission Of Material Fact

Plaintiffs' fraud claim is premised on representations made, or omitted, in the Seller's Disclosure attached to the Purchase Agreement. Plaintiffs assert that the Seller's Disclosure (1) failed to disclose Lot 143's "drainage problems" as a condition materially or adversely affecting the property; (2) failed to disclose problems with drainage affecting common areas in the Subdivision; and (3) contained various other material misrepresentations and omissions.[40]

### 1. Failure To Disclose Lot 143's "Drainage Problems" As A Condition Materially Or Adversely Affecting The Property

Plaintiffs' primary argument is that the Seller's Disclosure failed to disclose Lot 143's drainage problems as a condition "materially or adversely affect[ing]" the property.[41] Question 24 in the Seller's Disclosure asks, "Are you aware of anything . . . you should disclose to a prospective Buyer because it may materially or adversely affect the property?"[42] Defendants answered "No."[43] Plaintiffs contend that significant, ongoing drainage problems on Lot 143 materially and adversely affect

---

[40] Pls.' Post-Trial Op. Br. [hereinafter, "POB"] at 8-9, 13, 15-16, 28, Dkt. 65. *See also id.* at 29 (alleging Defendants "intentionally with[eld] material information about Lot 143 when they sold it to [Plaintiffs]").

[41] *Id.* at 32.

[42] PX 2 at 2.

[43] *Id.*

the property, rendering Defendants' answer to Question 24 a false representation and the failure to disclose such problems a material omission.[44]

At trial, Plaintiffs failed to prove that drainage problems on Lot 143 materially or adversely affected the property at the time the Seller's Disclosure was made or before settlement.

First, Plaintiffs make much of their neighbors nicknaming Lot 143 "Jones' Fishing Hole" years before the lot was developed.[45] But even assuming Lot 143 was at one point known to hold standing water, such does not demonstrate a drainage problem on the property at the time the Seller's Disclosure was made, years later.

Second, at trial, Mr. Mack testified that water pools on Plaintiffs' property "almost every time it rains,"[46] but nearly every photograph that Plaintiffs introduced to demonstrate standing water on Lot 143 was rebutted by weather reports showing it had rained at least forty-eight hours before the photograph was taken.[47] Plaintiffs suggest that a "forty-eight hour" rule-of-thumb is not dispositive,[48] but Plaintiffs also

---

[44] POB at 32.

[45] PX 19.

[46] Tr. 24:20-25:3.

[47] *See* notes 29, 30, *supra*.

[48] *See* Tr. at 252:5-24 (explaining that the forty-eight-hour rule is not a "regulation[]" but agencies use it as a "rule of thumb of whether there is a drainage problem . . . looking after a . . . normal rainfall, and even extreme conditions, if the water dissipated in a reasonable

14

failed to identify any instances when water failed to drain from the property within an "unreasonable" period of time.

Third, Mr. Mack testified that the sump pump in his home discharges frequently, often keeping him awake at night.[49]  But Plaintiffs failed to tie the sump pump's supposed overactivity to a drainage problem.  Rather, the record shows that the sump pump is functioning properly and has kept the home dry.[50]

In short, Plaintiffs failed to meet their burden to demonstrate that at the time the Seller's Disclosure was made or before settlement, Lot 143 had "drainage problems" materially or adversely affecting the property that should have been disclosed.

---

amount of time"); *see also* Am. Compl. ¶ 24 (alleging "[d]uring periods of moderate rain, storm water is directed onto Mack's real property from where it is unable to effectively drain within a period of forty-eight (48) hours or more"); DX 20 at 6 (providing, under "Warranty Standards and Coverage for Year One Only," that "[a]fter normal rainfall, water should not stand in yard within 10 feet of dwelling for more than 48 hours").

[49] Tr. at 62:9-12.

[50] *See id*. at 148:21-23 (Plaintiff testifying that the crawl space has remained dry).  Plaintiffs assert that "sump pumps [d]o not tend to operate when crawl spaces are dry."  Pls.' Post-Trial Ans. Br. [hereinafter, "PAB"] at 4, Dkt. 70.  That is wrong; sump pumps pump excess water out of the crock to ensure that a crawl space or basement remains dry.

Notably, Plaintiffs do not contest that the home was built to code and compliant with County requirements, or that the sump pump crock is positioned sufficiently above the ground water elevation.  *See* POB at 34; PAB at 1, 5, 13; Tr. at 395:6-396:4.  And Plaintiffs likewise do not contest that the Milton II model floor plan they received showed the sump pump would be located below the master bedroom.  *See* PX 1 at 25 (Milton II Model floor plan); *see also* Tr. at 77:7-12.

### 2. Failure To Disclose Problems With Drainage Affecting Common Areas In The Subdivision

Plaintiffs also assert that the Seller's Disclosure failed to identify problems with drainage affecting common areas in the Subdivision, which have contributed to drainage problems on Lot 143. Question 10 in the Seller's Disclosure asks, "Is there any defect, damage or problem with any common elements or common areas?"[51] Defendants answered "No."[52] Plaintiffs contend this representation was false, and that Defendants should have disclosed the "decade long dispute between [SCED,] [SCD] and Defendants" over how to resolve ongoing drainage problems throughout the Subdivision.[53]

Plaintiffs' arguments rest on a mischaracterization of the trial record, which shows that Defendants completed all drainage improvements affecting Lot 143 before the Purchase Agreement was signed on October 21, 2015.

Specifically, the record shows that SCD and SCED were aware of problems with contributory drainage and roadside swales within the Subdivision by early 2015.[54] But in February 2015, Heron Bay LLC prepared the 2015 Stormwater Management Plan, which was approved by both SCD and SCED, to improve

---

[51] PX 2 at 2.

[52] *Id*.

[53] POB at 5, 7, 30; PAB at 5.

[54] DX 7; Tr. at 162:14-15.

drainage throughout the Subdivision.[55]  On June 15, 2015, SCED reported that drainage improvement for Lots 125 through 149 was "largely complete," and on September 15, 2015, SCED confirmed that the drainage improvement for those lots "ha[d] been completed and [wa]s being monitored by the [SCD]."[56]  Defendants' failure to disclose drainage improvements that had already been completed by the time the Purchase Agreement was signed is immaterial. *See Grzybowski*, 2013 WL 4053515, at *4 (finding "the sufficiency of [a] disclosure about [a] leak in the Defendant's [condominium] unit [wa]s immaterial" where "the repairs were effective, and the Plaintiffs ha[d] suffered no damages from what they characterize as the inadequate disclosure").

Plaintiffs emphasize that after September 2015, Defendants still continued to work with SCD and SCED to address other outstanding requests, going so far as to suggest that the "lack of meaningful response by Defendants" in addressing SCD's and SCED's concerns over "flooding and drainage" led to the execution of a March 17, 2017 MOU between Defendants and Sussex County.[57]  The record shows, instead, that SCED acknowledged in early March 2017 that any "remaining drainage issues [in the Subdivision] [we]re not 'significant,'" and the MOU largely addressed

---

[55] DX 4.

[56] DX 10; DX 12.

[57] POB at 32.

17

other unrelated requests.[58]  To the extent Plaintiffs assert that Defendants should have disclosed those other requests, Plaintiffs have not proven such omissions were material, as they do not claim to have suffered any harm from Defendants' failure to disclose problems in the Subdivision that do not relate to drainage issues impacting Lot 143.[59]

### 3.  Other Alleged Misrepresentations And Omissions

Plaintiffs point to several other questions and answers in the Seller's Disclosure that they believe constitute material misrepresentations or omissions.  For example, Question 22 asks, "Are you aware of any existing or threatened legal action affecting the property?"[60]  Defendants answered "No."[61]  Plaintiffs have not identified any existing or threatened legal action affecting Lot 143.  Question 23 asks, "Do you know of any violations of local, state, federal laws, or regulations relating to the property?"[62]  Defendants answered "No."[63]  Plaintiffs have not identified any such violations.  Question 32 asks, "Is the property located in a flood

---

[58] PX 9; PX 10.  *See* note 21, *supra*.

[59] *See, e.g.*, POB at 35 (explaining that "to the Macks, the condition of *the building lot they were buying* was important") (emphasis added).

[60] PX 2 at 2.

[61] *Id*.

[62] *Id*.

[63] *Id*.

zone?"[64] Defendants answered "No."[65] That response was true.[66] Question 35 asks, "Are there any swales crossing the property that are under the control of a Soil and Conservation District?" Defendants answered "No."[67] That response was also true. The Subdivision was monitored, not "controlled," by SCD.[68]

Plaintiffs also take issue with Defendants' response to Question 30, which asks, "Is there any fill or expansive soil on the property?"[69] Defendants answered "Yes."[70] Plaintiffs do not contest that this response was true, but point out that the Seller's Disclosure instructs the Seller to provide additional information and Defendants failed to do so.[71] Plaintiffs knew, however, that additional information was not provided, did not request further details, and instead proceeded with the

---

[64] *Id.*

[65] *Id.*

[66] DX 16 (showing Lot 143 was outside the FEMA 100-year floodplain); Tr. at 186:18-19. *See also* POB at 33 (conceding that "Lot #143 is not located in an officially designated flood zone").

[67] PX at 2.

[68] *See also* POB at 34 (stating that "swales on the property were being monitored and supervised"—*not* "controlled"—"by Sussex Conservation District when Lot 143 went under contract").

[69] PX 2 at 3.

[70] *Id.*

[71] POB at 8.

transaction.[72]  In any event, any such omission was immaterial.  Plaintiffs suggest Defendants should have disclosed the composition of the fill material because "the quality of the fill used affect[ed] the flooding condition of the property."[73]  In other words, Plaintiffs' materiality argument rests on the premise that Lot 143 fails to drain properly, which, again, Plaintiffs failed to prove.  Moreover, at trial, Defendants presented persuasive expert evidence showing that the soil types used as fill on Lot 143 complied with approved plans and exceeded building code requirements.[74]

Finally, Plaintiffs contend that Defendants defrauded them by failing to disclose drainage easements affecting Lot 143.[75]  Question 16 asks, "Are you aware of any rights-of-ways, easements, or similar matters that may affect the property?"[76]  Defendants answered "Yes.  Normal utility easements, drainage easements, and rights of way apply as indicated on record."[77]  Plaintiffs correctly observe that the

---

[72] *See Dreisbach v. Walton*, 2014 WL 4352100, at *5 (Del. Super. Aug. 29, 2014) (finding a plaintiff's reliance on inaccurate information in a seller's disclosure unjustifiable where plaintiffs "knew there were questions left blank in the [d]isclosure document" such that it was "unreasonable for [p]laintiffs to rely on the document as complete").

[73] POB at 33.

[74] *See* Tr. at 398:8-399:20.  Although Plaintiffs' expert claimed the fill used on Lot 143 was not "standard practice," *id*. at 365:7-16, Plaintiffs failed to prove by a preponderance of the evidence that the fill used on Lot 143 constituted a defect on the property or otherwise necessitated further disclosure.

[75] POB at 31.

[76] PX 2 at 2.

[77] *Id*.

February 2015 Stormwater Management Plan recommended a fifteen-foot drainage easement between Lot 143 and Lot 144, but only a five-foot easement on Lot 143 was recorded.[78] At trial, Ms. Watson explained that the easement proposed in the February 2015 Stormwater Management Plan had to be adjusted because a concrete driveway already existed on Lot 144, where the proposed easement would have been.[79] But in any event, Plaintiffs were on record notice of the easement when they signed the Purchase Agreement.[80]

Accordingly, Plaintiffs have not met their burden to prove that Defendants misrepresented or omitted any material information in the Seller's Disclosure.

**B.  Defendants' Knowledge Or Belief That The Representation Was False, Or Was Made With Reckless Indifference To The Truth**

Even if any of the allegedly inadequate disclosures were material, Plaintiffs have not met their burden of proving scienter.

As already detailed above, the record shows that SCED informed Defendants on September 15, 2015 that drainage improvements to Lots 125 through 149 were complete.[81] On October 9, 2015—less than two weeks before the Purchase Agreement was signed—Mr. Krapf, the Chief Development Officer of LC Homes,

---

[78] DX 4; DX 19; *cf.* DX 5; DX 9.

[79] Tr. at 280:13-17.

[80] DX 9; Tr. at 71:19-22.

[81] DX 12.

responded to SCED, confirming that "the drainage improvement project in the vicinity of lots 125 thr[ough] 149 ha[d] been completed" and "the repairs performed well during the recent heavy rains."[82] Mr. Krapf also testified that he was not aware of any drainage issues on those lots after that time.[83] Based on the evidence presented, I find that at the time Defendants made the Seller's Disclosure and through settlement, they honestly and reasonably believed the improvements had resolved any drainage issues on Lot 143 and surrounding lots.

Plaintiffs contend that Defendants must have known about drainage problems on Lot 143 because "they . . . br[ought] in organic bearing soil to hide the problem," and installed an external drainage system because they "knew the house was not being built on well-drained soils."[84] If anything, these arguments underscore

---

[82] DX 14.

[83] Tr. at 502:11-15.

[84] POB at 29. Plaintiffs assert that Defendants' decision to install an exterior drain and waterproofing around Plaintiffs' home is tantamount "to a confession by Defendants that they kn[e]w of the water drainage and flooding problem on the building lot" because "[a] drainage system is not required when the foundation is installed on well-drained ground." PAB at 3. At trial, Meaghan Lester McDonough, Vice President of Geo-Technology Associates, refuted that argument, explaining that "it is common practice to have an exterior drain whether the soils are well drained or poorly drained," and "[most builders] go above and beyond the minimum [code] requirements." Tr. 416:6-417:2.

Defendants' good faith efforts to ensure that Lot 143 was properly graded and would be well drained, consistent with the February 2015 Stormwater Management Plan.[85]

For these reasons, I conclude that, even if Plaintiffs had proven a material misrepresentation or omission (and they did not), their fraud claim fails because they did not prove that Defendants knew any representation was false at the time they made the Seller's Disclosure or before settlement.[86]

## III.    CONCLUSION

As explained above, Plaintiffs have failed to meet their burden of proving that Defendants misrepresented or omitted material facts in connection with the Purchase Agreement, or that Defendants knew any such disclosures were false or misleading. Accordingly, I recommend that the Court enter judgment in favor of Defendants and deny Plaintiffs' request to rescind the Purchase Agreement.

---

[85] At trial, the parties presented evidence concerning Defendants' attempts to resolve Plaintiffs' complaints before and after this litigation was filed.  *See* note 34, *supra*; DX 41; *see also* POB at 22-23.  I draw from that evidence no conclusions as to Defendants' knowledge at the time the Seller's Disclosure was made.  *See* D.R.E. 407; D.R.E 408(a).

[86] In post-trial briefing, Plaintiffs reference the implied covenant of good faith and fair dealing.  POB at 36-37.  Because the Amended Complaint does not allege a claim for breach of the implied covenant of good faith and fair dealing, and Plaintiffs did not introduce any evidence at trial to prove such a claim, I do not address the implied covenant here.

This is a final report pursuant to Court of Chancery Rule 144.[87]  Any prior stay of exceptions is hereby lifted.

---

[87] *See* Ct. Ch. R. 144(d)(1) ("In actions that are not summary in nature or in which the Court has not ordered expedited proceedings, any party taking exception shall file a notice of exceptions within eleven days of the date of the report.").